**Ruth Louise WILLIAMS, Plaintiff,**

**v.**

**Agnes BAMBAUER, Defendant.**

**Edward SMITH, Plaintiff,**

**v.**

**Agnes BAMBAUER, Defendant.**

**Nos. GC 7061, 7064–K.**

United States District Court,
N. D. Mississippi,
Greenville Division.

April 13, 1971.

Frank S. Thackston, Jr., Greenville, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In these consolidated diversity actions, Ruth Louise Williams and Edward Smith, Louisiana citizens and adult children of the defendant, sue their mother, Agnes Bambauer, a Mississippi citizen, for bodily injuries sustained by them in a one-car accident occurring on February 5, 1970. On that date, the defendant was driving a Ford Falcon station wagon in which plaintiffs were riding as rear-seat passengers, when the automobile, proceeding northwardly on U. S. Highway 49W in Humphreys County, Mississippi, ran off the left (or west) side of the highway into a water-filled ditch, causing serious personal injuries to both plaintiffs.

Plaintiffs contend that the accident was proximately caused by defendant's negligence in her failure to exercise reasonable care to keep the vehicle under control. Defendant denies she was negligent, and asserts affirmatively that the automobile became uncontrollable as the result of a sudden emergency for which she was not responsible.

On February 19, 1971, the issues were tried to the court without a jury and after submission of briefs by both sides, the case is now ripe for decision on the merits. The court's findings of fact and conclusions of law are set forth in this opinion.

Many background facts relating to this intra-family litigation [1] are undisputed. On the day before the accident, defendant and plaintiffs had traveled in defendant's station wagon from Greenville to Florence, Mississippi, for the purpose of bringing Mrs. Allie Crane, defendant's sister, to live with defendant at the latter's home in Greenville. After an overnight visit, plaintiffs, defendant

Fountain D. Dawson, Greenville, Miss., Francis S. Bowling, Jackson, Miss., for plaintiffs.

1. Plaintiffs' counsel have "helpfully" filed with the Clerk defendant's automobile liability insurance policy, which this court is obliged to ignore in its consideration of the issues of liability and damages.

and Mrs. Crane departed Florence at 9 a. m. in the station wagon, which was driven by the defendant at all pertinent times. Throughout the journey Mrs. Crane was seated in the right front, plaintiff Smith in the right rear and plaintiff Mrs. Williams in the left rear. Several stops during the travel had been made, including a last stop at Louise, Mississippi, where plaintiff Smith purchased a carton of milk for defendant. Defendant did not immediately consume the milk but drove on approximately eight miles north, traveling at 40 to 50 mph in the right lane of a standard two-lane concrete highway.

At the critical moment, defendant was on the verge of stopping the car to drink the milk and for her son to relieve her at the wheel; she was at that very moment meeting a school bus southbound in the opposite lane of traffic. Suddenly, a loud noise, like a gunshot, was heard, immediately after which defendant apparently lost control of the vehicle. She allowed it first to go off on the right shoulder, steered it back onto the highway, the car angling from right to left on the concrete surface for 50 to 60 feet, and then for an additional unspecified distance off the west shoulder of the highway, crossing a steep embankment and landing in a ditch where the car came to rest with its rear wheels submerged in several feet of water.

Deputy Sheriff Everett, who investigated, noted certain markings on the highway and also that the shoulder on the right side was smooth with a drop-off of not more than two inches from the eastern edge of the concrete portion of the highway. Plaintiff Smith stated to the investigating officer and others at the accident scene that a tire on the car had blown out and defendant had lost control.

Later that same day, Clarence Watson, in charge of a wrecker, arrived at the scene and observed the position of the vehicle, with its rear wheels partially submerged in water. He hooked the station wagon to his wrecker and pulled it from the ditch before noticing that the left rear tire was flat. At that point he took off the tire, casually noting it was "a little loose from the rim", and that this condition existed "on the inside portion of the rim." The spare tire was mounted and the flat tire with its wheel placed in the rear of the station wagon. This witness made no further examination of the tire.

The left rear tire was a Goodyear tubeless polyester 2-ply tire with a 4-ply rating, which had been run about 4000 miles. The wrecked station wagon was taken to the Ford place at Leland, Mississippi; the flat tire, still on the wheel, was delivered by Smith to his attorney after Smith got out of a Greenville hospital which he and Mrs. Williams both entered to receive medical attention for their personal injuries. After delivering the tire and wheel to his attorney, Smith did not see either again until time of trial.

Two weeks later—on February 18—H. L. McKenzie, an independent auto appraiser, thoroughly inspected defendant's damaged automobile which had not been repaired. After road-testing the station wagon, he found it to be in good mechanical condition with its power steering normal and its brakes effective. He determined from its speedometer reading that the vehicle had been driven 4000 miles. Several days later McKenzie examined the flat tire taken from the left rear which was still mounted on the wheel and photographed both sides. The tire was inflated and a hole located in the tread of the tire about the size of the shaft of an ice pick. McKenzie in fact placed an ice pick in the hole and made photographs both outside and inside of the tire (Exh. 12). Removing the tire from the rim, this witness found nothing else remarkable. Furthermore, he found no marks indicating that the tire had been run flat on the rim, and, by inflating the tire to 32 pounds air pressure, determined that without load it would take approximately one minute for it to go flat. This expert was of the opinion that no noise or loud report would be

made from a tire's puncture or perforation of the size and location which he found to exist. In McKenzie's view, the tire did not rupture to cause a blowout nor had it been run flat on the rim. McKenzie made no tests, however, to determine at what air pressures the tire might seat or unseat from the rim but affirmed that on his original inspection the bead of the tire was seated on both sides of the rim where it should be for the tire to hold air.

Defendant's expert was William T. Purcell, Jr., a graduate mechanical engineer in charge of Pennsylvania Tire Company's technical service department at its manufacturing plant located at Tupelo, Mississippi. Subsequent to McKenzie's examination, the tire and wheel were delivered to Purcell, who made an extensive study. He confirmed McKenzie's finding as to the location and size of the single puncture site and that air escaping from such perforation would not produce a noise or sound like an ordinary blowout. This expert also noted there were no observable signs that the tire had run flat, but he did not rule out the possibility of internal damage or that a tire, upon becoming instantaneously deflated, might run flat without visible marks or damage. The witness, however, criticized the construction of the tire and was of the opinion that, because of deficiencies in manufacture, the tire had an excessively thin inner-lining which caused it, in his judgment, to rip and expel air at a rate faster than proper for a tubeless tire, and the tire's diameter was incorrect, causing the bead to unseat, or leave the rim, when the tire had as much as 20 pounds air pressure, which unseating is said to occur twice as fast as it should. Purcell stated that his tests also indicated that the tire seated on the rim at 8 pounds pressure when it should not have seated until it had at least 16 pounds pressure, thus suggesting to him that the tire both seated and unseated improperly, and, when inflated at 32 pounds air pressure, was subject to unseating within 10 seconds. Purcell concluded that

the aforesaid deficiencies made the tire unsafe for use, and when punctured, it ripped and expelled air excessively, which, in turn, caused an immediate unseating of the bead from the rim, to produce a noise similar to a blowout. This witness expressed an opinion that in the instant case an unseating had occurred on the basis that "a noise was heard" and "a flat tire seen".

At the trial Mrs. Crane did not appear because of illness. The defendant and both plaintiffs, however, testified as witnesses. The defendant (age 62) stated that she had been accustomed to driving a pickup truck without power steering; that she had been driving the station wagon, recently bought new, for only several weeks prior to the accident. Initially she had found the power steering too loose and had the condition corrected. The trip to Florence was her first highway travel in the station wagon, and she stated that after the accident she had the power steering removed. She testified that all four wheels were on the paved surface when she heard the noise, just after which the car went to the right. Her testimony then becomes somewhat contradictory in that she testified first that she was "in process of stopping to drink milk", and later that she was not "intending to drive off the road", and "in a split second" was back on the highway, having lost control of the car. Denying that she was in any manner distracted, defendant maintained that she had both hands on the steering wheel when the car went off on the right shoulder. It does not appear at what point, if at all, defendant applied brakes to stop the automobile from going off the highway, nor did she attempt to explain why the automobile went out of control, other than to state she was frightened by the noise and the closely approaching school bus in the left lane of traffic.

Smith testified that the car did not swerve until it dropped off the right edge of the concrete surface where the road had been repaired and that the car went an overall distance of about "two

telephone poles apart" before leaving the left side of the roadway; and when defendant steered the car back onto the concrete surface it started swerving and went out of control. Smith acknowledged that he assumed that a tire had blown out and that he had made various statements to that effect as well as that the defendant had done her best to hold the car on the highway.

Mrs. Williams testified only as to hearing the noise and noting the car swerving in the highway before she blacked out, stating that she did not come to until she was being transported to a hospital in an ambulance. She did report to her attending physician, however, that the collision had been caused by a blowout and on pre-trial deposition acknowledged that the defendant "could not help it, she could not avoid it. She just lost control of the station wagon."

It is familiar Mississippi law that the operator of a motor vehicle on its highways has a duty to exercise ordinary care toward other persons by keeping his vehicle on the highway in its own lane of traffic and under proper control and must maintain an adequate lookout for the normal risks attendant to operation of a motor vehicle on a public highway.[2] In Mississippi this duty of ordinary care extends not only to occupants of other vehicles, but also to his passengers, even if they be his own adult, emancipated children.[3] Where, as in the case at bar, a driver crosses over the left side of the highway and crashes into the ditch on a dry, straight stretch of road, the fact-finder may infer therefrom that the driver was negligent and failed to do what an ordinarily careful and prudent person would have done under the circumstances.[4] Otherwise stated, if plaintiffs put on evidence of circumstances tending to show that an accident ordinarily would not have happened without negligence on the part of the driver, the finder of fact may infer from that circumstantial evidence that the driver was negligent.

To rebut the prima facie evidence of negligence which the court finds was created by plaintiffs' proof in this cause, defendant offered evidence to show that Mrs. Bambauer lost control of her car through no fault of her own, but because of tire failure creating a sudden emergency which she did not cause and over which she had no control. Under the "sudden emergency" doctrine as applied by Mississippi courts, a driver confronted with sudden peril requiring instinctive action is not held to the same degree of care as he would be if he had ample time for reflection, and in the event that a driver suddenly meets with an emergency which naturally would overpower the judgment of a reasonably prudent driver rendering him momentarily incapable of deliberate and intelligent action, and as a result thereof he injures an innocent third person, the driver is not negligent if he used due care to avoid meeting such an emergency, and after it arose, exercised such care as a reasonably prudent and capable driver would have used under the particular circumstances.[5]

2. Parkins v. Brown, 241 F.2d 367 (5 Cir., 1957); Reed v. Eubanks, 232 Miss. 27, 98 So.2d 132 (1957); violation of Mississippi statutes relating to driving on right side of highway and remaining in one's own lane constitutes prima facie evidence of negligence when neither explained nor excused: Miss.Code Ann. §§ 8181, 8187; Nobles v. Unruh, 198 So.2d 245 (Miss. 1967); Lum v. Jackson Industrial Uniform Service, 253 Miss. 342, 175 So.2d 501 (1965).

3. Hatcher v. Daniel, 228 Miss. 196, 87 So. 2d 490 (1956); Lancaster v. Lancaster, 213 Miss. 536, 57 So.2d 302 (1952); 67 C.J.S. Parent & Child § 61(b) (2), p. 789; 1 Sherman & Redfield on Negligence, § 141, p. 339.

4. Johnson v. Foster, 202 So.2d 520 (Miss. 1967), where the doctrine of res ipsa loquitur was held applicable to closely analogous facts.

5. Moore v. Taggart, 233 Miss. 389, 102 So. 2d 333 (1958); Phillips v. Delta Motor Lines, Inc., 235 Miss. 1, 108 So.2d 409 (1959); Burnett v. Avera, 203 So.2d 788 (Miss.1967); see also 7 Am.Jur.2d, Auto-

In the case sub judice the sole emergency claimed was the alleged instantaneous deflation of defendant's left rear tire. Notwithstanding that the plaintiffs may have assumed that a blowout had occurred, the overwhelming evidence is that a conventional blowout did not occur and the hole in the tire was not, in itself, sufficient to produce appreciable noise or instantaneous deflation. The only possible way in which the tire might have suddenly and noisily deflated was by unseating from the rim, as suggested by defendant's expert.

There are sharp disputes in the evidence as to whether the tire actually unseated from the rim. Watson, the first person to observe the tire after the accident, stated that it was still seated on the rim on the outer side of the wheel, but was a little loose or unseated on the inner side. It is not suggested that the tire was re-inflated or changed in any manner prior to McKenzie's subsequent inspection. The witness McKenzie testified that when he first observed the tire, it was firmly seated on the rim on both sides, although he noted traces of caked mud on the very outer edge of the rubber bead of the tire and just inside the flange of the metal rim adjacent thereto, which traces were still evident at trial. McKenzie did not notice any trace of mud inside the tire, however, despite the fact that it admittedly remained for some time under water and in mud with the tire allegedly loose from the rim. Upon examining the tire and wheel offered in evidence, the court finds an absence of any trace of mud across either the rim or bead of the tire except at the outer edges, as McKenzie stated. Moreover, as the experts agreed, the tire itself showed no telltale marks that it had been run flat on the rim, some indication of which would almost

necessarily have resulted from the station wagon traveling some 60 feet on concrete, down a steep embankment, and landing in a ditch. Had the tire unseated, it would have gone "dead flat" at once, causing the empty tire to be pressed and twisted between the concrete and the metal rim, beneath the weight of the loaded station wagon.

■ Resolving conflicting inferences from the evidence, the court finds as a fact that the tire went flat because of an ordinary puncture, and not from unseating from the rim, and hence the accident was proximately caused by defendant's failure to exercise ordinary care—not by failure of the tire. As the trier of the facts, we hold that she did not use ordinary care expected of a reasonably prudent driver under like circumstances.

In reaching the above conclusion, the court has not overlooked the testimony of defendant's expert, especially his opinion regarding the deficiencies in the manufacture of the tire. The whole evidence impels us to reject his conclusion that these deficiencies had any causal relation to the accident; at most they are mere conditions which he found to exist at a later point in time. Mr. Purcell's opinion that an unseating occurred appears to be primarily based upon the fact that a loud noise was heard just before the car went to the right. Putting assumptions aside, we find no evidentiary support that the noise was more likely caused by tire deflation than by a number of other possible causes, e. g., a backfire of the school bus or a nearby gunshot or firecracker. Considering the highway conditions and the absence of any satisfactory explanation for defendant's failure to keep or bring the station wagon under control before leaving the left side of the highway, the court is

mobiles & Highway Traffic, §§ 359, 360; Prosser, Law of Torts, pp. 171–173; Restatement of Torts 2d § 296. As Mr. Justice Cardozo once stated the rule: " 'Errors of judgment,' however, would not count against him if they resulted 'from the excitement and confusion of the moment.' * * * The reason that was exacted of him was not the reason of the morrow. It was reason fitted and proportioned to the time and the event." Wagner v. International R.R., 232 N.Y. 176, 177, 133 N.E. 437, 438 (1921).

persuaded that the accident was the result of a want of due care by defendant.

Even assuming that the tire might have deflated suddenly, there is credible evidence of defendant's negligence in the operation of the station wagon and that the accident was not the product of a sudden emergency. Although defendant denied that she lost control of the car through her own lack of care, the court finds from the evidence that her inattention at the wheel, her unfamiliarity with the power steering, and her failure to apply brakes after she felt the car leaving her control, substantially contributed to the accident and attendant injuries. Despite plaintiffs' opinions that defendant did her best to hold the car on the road, the proper test as to negligence was not whether the defendant, after the emergency arose, "did everything within her power to avoid the collision," "but whether, * * * she exercised such care as a reasonably prudent and capable driver would use under the unusual circumstances." [6] Although this case is not without its evidentiary difficulties, the court is persuaded that the defendant failed to exercise the requisite care.

■ Having determined the issue of liability, we briefly review the damages sustained by each of the plaintiffs. Edward Smith, 42 years of age, sustained a fracture of the right jaw. This injury required hospitalization and treatment by a plastic surgeon, in which his teeth were immobilized for a period of three weeks. Surgical appliances were then removed from his mouth because he could no longer tolerate the pain, and it was impossible to establish normal realignment of the right jaw due to the pre-existing absence of upper teeth. This condition resulted in a partial deformity of the right jaw with inefficient ability to masticate food. After five months convalescence, Smith returned to his maritime employment at which he had worked irregularly. He has encountered pain and difficulty in eating hard foods and restricts his diet to avoid such discomfort. His jaw condition produces a degree of permanent disability which cannot be medically corrected so that he will have some limitation of motion in mastication and a degree of pain and discomfort when eating; but it is a condition not otherwise disabling or preventing the pursuit of his usual employment. We set aside from view the fact that Smith had sustained prior injuries to his neck and back, which may materially affect him in his ability now to hold continued employment as a deckhand, boat pilot or to do heavy work. We ascertain his damages to be $15,350, consisting of $1,350 hospital, doctors', dental and drug bills, $2,000 loss of wages during the period of convalescence, and $12,000 for physical pain and suffering, mental anguish, embarrassment and humiliation for the injuries to his right jaw and its resultant effect.

■ The plaintiff Mrs. Williams, 44 years of age, sustained a painful back injury consisting of a compression fracture of the first lumbar vertebra. On the day of the accident she was admitted to the hospital where she remained for six weeks, during which time she was given heavy sedation and muscle relaxants. She responded to conservative treatment and was supplied with a back brace which she wore for a period of several months following her discharge from the hospital. On October 6, 1970, the date of her last visit to her attending physician, he found her to be without permanent disability and to have effected a normal recovery. While she complains of continuing episodes of pain and nervousness, this does not disable her from following her usual employment. The evidence indicates that Mrs. Williams, prior to the accident, had worked in florist shops and also on a farm. We conclude that her loss of wages during the eight-month period of her convalescence was $2,000 calculated at $250 per month; and her hospital, medical, drug and other special expenses

6. Moore v. Taggart, supra, 102 So.2d at.p. 338.

amounted to $2,250. Adding an additional sum of $5,000 as reasonable compensation for her past, present and future physical pain and suffering and mental anguish, we make a total award to Mrs. Williams of $9,250.

Judgment for plaintiffs shall be entered accordingly.